UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

TREVOR DAY,
KIMBERLY NICOLE WOOD,

     **Plaintiffs,**

v.                           **CASE NO. 5:19cv506-MCR/MJF**
                                         **5:19cv505-MCR/MJF**

DONALD EDENFIELD IN HIS
OFFICIAL CAPACITY AS SHERIFF
OF JACKSON COUNTY FLORIDA, and
ZACHARY WESTER,

     **Defendants.**

_____/

## ORDER

     In this case, Plaintiff Trevor Day and Plaintiff Kimberly Wood challenge a traffic stop resulting in their arrest as unconstitutional, under 42 U.S.C. § 1983. They also bring several state law claims arising from the incident.  These cases are among nearly 40 individual cases filed against the Sheriff of Jackson County, Florida, and former Deputy Zachary Wester, alleging that Wester, assisted in some cases by Deputy Trevor Lee, made pretextual traffic stops during which Wester planted controlled substances in vehicles and then falsely arrested the drivers or passengers.[1]  It is also claimed that the Sheriff condoned the alleged unconstitutional

---

[1] Deputy Trevor Lee is not a defendant in this case.

practices, was negligent in hiring, supervising, and retaining the deputies, and is liable for their misconduct under state law. The cases were consolidated for discovery purposes, and the above-named cases were selected as members of the first discovery pool.[2]

Before the Court are Wester's and the Sheriff's motions to exclude the expert opinions and testimony of the Plaintiffs' expert, Dr. Roy Bedard, under Federal Rules of Evidence 702 and 403, and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Having fully reviewed the arguments and the record, the Court grants the motions, as follows.

## I.   Background

On May 4, 2018, Trevor Day was driving a vehicle with passengers Kimberly Wood and Ashton Johnson. Day was waiting to pull out of a McDonalds and forgot to turn on his headlights immediately. Wester initiated a traffic stop based on the

---

[2] The Court is addressing Day and Wood in one order because their claims arose out of the same incident. The first discovery pool now consists of six cases—April Marie Adkins, Case No. 5:18cv271-MCR-MJF, Teresa Odom, Case No. 5:19cv253-MCR/MJF, Trevor Day, Case No. 5:19cv506-MCR-MJF, Kimberly Wood, Case No. 5:19cv505-MCR-MJF, James Fears, Case No. 5:19cv524-MCR-MJF, and Christopher Marr, Case No. 5:19cv519-MCR-MJF. Motions for summary judgment and partial summary judgment remain pending and will be resolved by separate order. Whether the first discovery pool cases will be bifurcated for trial is an outstanding issue to be addressed by separate order after the dispositive motions have been resolved. A second discovery pool of cases was also selected, has proceeded through discovery, and will be addressed separately.

CASE NOS. 5:19cv506-MCR/MJF, 5:19cv505-MCR/MJF

lights.  Wester approached the driver's side of the vehicle and asked Day to step out. Wester reported that he smelled marijuana smoke coming from the vehicle and asked Day and Wood if they had been smoking marijuana.  Day admitted to Wester that they been smoking earlier, but not in the car, and he consented to the search.  ECF No. 33–1 at 41 (5:19cv506-MCR-MJF[3]).  Wester searched the car while Day, Wood and Johnson waited in the patrol car.  He reported finding a plastic baggie containing a green leafy substance, which he said was marijuana (4.7 grams); a black pouch containing a thick white residue, which field tested positive for methamphetamine; a torn plastic baggie containing a crystallized residue, which field tested positive for methamphetamine; and numerous shards of a crystallized substance that field tested positive for methamphetamine (1.89 grams).  Day admitted during his deposition that there were some old previously smoked marijuana "roaches" in the ash tray. ECF No. 33–1 at 38–39 (depo. at 37–38).   Wood told Wester that the methamphetamine did not belong to anyone in the car, that none of them used methamphetamine, and that they had just cleaned out the car.  Wester told Wood

---

[3] Unless otherwise specified, all record cites are to the Day case, 5:19cv506-MCR-MJF, using the CM/ECF page numbers.

CASE NOS. 5:19cv506-MCR/MJF, 5:19cv505-MCR/MJF

that if she did not know who the methamphetamine belonged to, she would go to jail.  There is body camera video of the encounter.

Wood and Day were charged with possession of methamphetamine, possession of drug paraphernalia, and possession of marijuana (less than 20 grams). Johnson was not searched or arrested.  On September 19, 2018, the State filed a *Nolle Prosequi* and dismissed all charges in both cases.

The Sheriff's Office began an internal investigation into Wester's practices in July 2018, when alerted by State Attorney Christina Pumphrey that Wester may have planted drugs in Teresa Odom's purse (a different plaintiff) based on the video camera footage.  She also found that Wester's arrest statistics were noticeably high and had observed inconsistencies between his sworn affidavits and the footage of his body camera.  In August 2018, the Sheriff requested that the Florida Department of Law Enforcement ("FDLE") conduct a criminal investigation into Wester's conduct.  In July 2019, following the investigation, Wester was arrested and charged with 67 criminal counts related to his official misconduct, including one count of racketeering and multiple counts of official misconduct, perjury, possession of a controlled substance and drug paraphernalia, and false imprisonment related to specific arrests.  A search after Wester's arrest uncovered illegal narcotics and drug

CASE NOS. 5:19cv506-MCR/MJF, 5:19cv505-MCR/MJF

paraphernalia stored in his patrol vehicle.  He was terminated from his employment, and in May 2021, a jury found him guilty on 19 counts involving three individuals. In September 2018, as a result of the FDLE investigation and a loss of confidence in the cases due to Wester's conduct, the State dropped 119 criminal charges that Wester had initiated, including Day and Wood's cases.

Day and Wood each brought suit for the violation of constitutional and state law rights, maintaining that Wester planted the evidence for which they were falsely arrested and maliciously prosecuted and engaged in a conspiracy and repeated pattern of violating constitutional rights, which the Sheriff ignored or condoned amounting to deliberate indifference. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) (holding a municipality may be liable for constitutional injury caused by the execution of a municipal custom or policy). They also brought state law claims against the Sheriff for false imprisonment/arrest and negligent hiring, supervision, and retention of Wester.

In support of their claims, Day and Wood retained Roy R. Bedard, Ph.D., a police practices expert who opines, in part, that Wester's conduct was not consistent with accepted police practices, that the Sheriff's Office had a well-settled custom of condoning Wester's misconduct by failing to supervise his work, and that the Sheriff

was negligent in hiring, supervising, and retaining Wester.  The Sheriff and Wester each moved to exclude or limit the expert testimony of Bedard, including his rebuttal report.

## II.    Legal Standards

Rule 702, as explained by *Daubert* and its progeny, governs the admissibility of expert testimony.  *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). Under Rule 702 and *Daubert*, district courts must act as "gatekeepers" to ensure the reliability and relevancy of expert testimony.  *Id.* (quoting *Daubert*, 509 U.S. at 589).  Expert testimony is reliable and relevant—and, therefore, admissible—when the following criteria are met: (1) the expert is sufficiently qualified to testify about the matters he intends to address; (2) the methodology used is "sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."  *Id.*  The Eleventh Circuit refers to these criteria separately as "qualification, reliability, and helpfulness," *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004), and has emphasized that they are "distinct concepts that courts and litigants must take care not to conflate," *Quiet Tech. DC-8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d

1333, 1341 (11th Cir. 2003).  These factors apply regardless of whether expert testimony is based on scientific, technical, or other specialized knowledge.  *See id.* (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)).  The party offering the expert has the burden of showing, by a preponderance of the evidence, that each of these requirements is met.  *Rink*, 400 F.3d at 1292.

To meet the qualification requirement, a party must show that its expert has sufficient "knowledge, skill, experience, training, or education to form a reliable opinion about an issue that is before the court." *Hendrix ex. Rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1193 (11th Cir. 2010) (citing Fed. R. Evid. 702).

To meet the reliability requirement for an expert witness whose opinion is based "solely or primarily on experience," as opposed to scientific methodology, "the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Frazier*, 387 F.3d at 1261 (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendments).  An expert may rely on "facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703.  The court's focus is on the expert's principles and methodology, not the conclusions generated.  *Daubert.*  509 U.S. at 595.  Regardless of whether

CASE NOS. 5:19cv506-MCR/MJF, 5:19cv505-MCR/MJF

expert opinion is based on professional studies or personal experience, the expert must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *McClain v. Metabolife Int'l, Inc*., 401 F.3d 1233, 1255 (11th Cir. 2005) (quoting *Kumho Tire*, 526 U.S. at 152). Any flaws in generally reliable evidence are best "tested by the adversary process—competing expert testimony and active cross-examination." *Quiet Tech*., 326 F.3d at 1345 (internal quotations omitted). "But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Moreover, the court does not "evaluate the credibility of opposing experts" or the persuasiveness of their conclusions.[4] *Id.* at 1341. Instead, the gatekeeping duty is limited to "ensur[ing] that the fact-finder weighs only sound and reliable evidence." *Frazier*, 387 F.3d at 1272. Because reliability is a "flexible" requirement, courts have "broad latitude" in determining both how and whether reliability has been satisfied. *Kumho Tire*, 526 U.S. at 141-42.

---

[4] *See Rink*, 400 F.3d at 1293 n.7 (explaining that evaluation of an expert's reliability is required by *Daubert*, whereas "an expert's believability or persuasiveness" is a matter "reserved for the trier of fact").

CASE NOS. 5:19cv506-MCR/MJF, 5:19cv505-MCR/MJF

To satisfy the helpfulness requirement, expert testimony must assist the trier of fact in understanding the evidence, must be relevant to an issue in the case, and must offer insights "beyond the understanding and experience of the average citizen." *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985); *see also Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) (noting *Daubert* requires expert testimony that is "relevant to the task at hand" (internal marks omitted)). Experts may express an opinion on an ultimate issue of fact, Fed. R. Evid. 704, but may not tell the jury what result to reach or testify to a legal conclusion. *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990). Also, "expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Knight through Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 808–09 (11th Cir. 2017) (quoting *Frazier*, 387 F.3d at 1262–63).

In the context of police practices, an opinion may be based on experience, as long as the "expert's role is 'limited to describing sound professional standards and identifying departures from them.'" *Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013) (quoting *West v. Waymire*, 114 F.3d 336, 652 (7th Cir. 1997)); *see also Samples v. City of Atlanta*, 916 F.2d 1548, 1551 (11th Cir. 1990) (finding most

of a "use of force" expert's testimony appropriate to the extent the jury was properly informed that "the expert was testifying regarding prevailing standards in the field of law enforcement").  A police practices expert may present factors that might inform an officer's decision regarding standards such as probable cause or the use of force when making arrests because "such testimony speaks to prevailing standards in law enforcement and may be quite helpful to the jury in conducting its own analysis of a false arrest claim." *Washington v. City of Waldo*, Fla., No. 1:15cv73-MW/GRJ, 2016 WL 3545909, at *5 (N.D. Fla. Mar. 1, 2016) (noting an expert may testify to relevant investigative practices and tactics but cannot state an opinion that the arresting officer in fact lacked probable cause).  In all cases, the trial judge must find that the expert testimony "is properly grounded, well-reasoned, and not speculative." *Frazier*, 387 F.3d at 1262 (quoting Rule 702 advisory committee's note).

Even if all three Rule 702/*Daubert* admissibility criteria are met, expert opinion testimony is still subject to exclusion under Rule 403, if its probative value is substantially outweighed by its prejudicial impact, if it presents a danger of confusing or misleading the jury, or if the testimony is cumulative or needlessly time consuming. *Frazier*, 387 F.3d at 1263.  And when evaluating expert testimony, the

court remains mindful of the delicate balance between its role as a gatekeeper and the jury's role as the ultimate factfinder. *Id.* at 1272. The gatekeeping role "is not intended to supplant the adversary system or the role of the jury." *Allison*, 184 F.3d at 1312; *see also Frazier*, 387 F.3d at 1272 (cautioning that only the jury determines "where the truth in any case lies," and the court "may not usurp this function").

## III. Discussion

### A. Roy Bedard, Ph.D., Opinions

Dr. Bedard opines generally that the police practices and procedures used by Wester during the stop and the related customs, policies, and practices of the Jackson County Sheriff's Office were not consistent with accepted law enforcement standards. Bedard's lengthy report, *see* ECF No. 33–4,[5] includes the following sections: I. Introduction, II. Qualifications and Background,[6] III. Materials Provided

---

[5] This initial report is dated December 18, 2019. In it, Bedard discusses Day and Wood's cases, among several others in which Wester has been accused of planting evidence.

[6] Bedard has a master's degree and Ph.D. in Educational Psychology. He served with the Tallahassee Police Department for 25 years, retiring in 2015, and has taught police procedures in a variety of police and corrections training programs for the last 32 years. He owns RRB Systems International, which is a police and public safety training and consulting business.

CASE NOS. 5:19cv506-MCR/MJF, 5:19cv505-MCR/MJF

for Review,[7] IV. Analysis Protocol, and V. Specific Details of the Complaint, and VI. Analysis, which includes his Summary of Opinions.

In the Analysis Protocol section, Bedard briefly explained that he relied on documents and data available to him from discovery materials and that these are the type of materials  typically relied on by consultants and experts in forming opinions and that he also relied on his "training, experience and advanced education in the field of use of force, defensive tactics and human performance."  ECF No. 33–4 at 7.  He acknowledged that his terminology may overlap with legal terms or standards but explained that the use of such terms is common in his field.  Bedard also stated that any assumptions of truth in the report were made solely for the purpose of analysis and not to assign credibility to any evidence or witness.  *See* ECF No. 33–4 at 7–8.

---

[7] Bedard's report states he reviewed the pleadings, the arrest affidavit, other materials from the plaintiffs' criminal files, the body camera videos, a chart of noncompliance with official policy, Wester's arrest log, the Sheriff's evidence tracking log, personnel files of Wester and Lee, policies of the Jackson County Sheriff's Office, FOIA internal affairs cases (January 2015–January 2019), newspaper articles, the PCA Warrant for Arrest of Wester, the FDLE report, the AXON device Audit Trail, a Florida Commission on Human Relations Whistle Blower Retaliation Charge of Discrimination by Christina Pumphrey, and videos of several traffic stops by Wester.  He also listed treatises or articles on Florida Basic Recruit Training Programs, use of force by police, and policing misconduct.

The bulk of Bedard's report recounts the facts of the cases he reviewed, including that of Day and Wood, viewed in the plaintiffs' favor, and his summary of the investigation into Wester's misconduct and the Sheriff's background investigation at the time of hiring him. Bedard determined that Wester stopped vehicles based on "shady probable cause," ECF No. 33–4 at 70, and after reviewing the facts of Day and Wood's stop, Bedard opined that "[t]here was no probable cause and/or reasonable suspicion for the stop or subsequent search" of their vehicle or person. ECF No. 33–4 at 40, 42.

Bedard opined that Wester, sometimes aided by Lee, exhibited a certain pattern of conduct during the searches. The pattern included failing to turn on the camera to document the stop in full or turning the camera off before any contraband was found, using an "abstract violation" to stop the vehicle or justify a search (such as traveling without headlights, smelling marijuana, or saying a canine officer was *en route* to prompt a consent to search), and abruptly returning to the patrol car before completing the final search (to retrieve black tactical gloves and secrete illicit drugs, according to Bedard), and finding the drugs (which he allegedly planted) on his return to the search. ECF No. 33–4 at 69–71, 81–82; ECF No. 33–5 at 105–106 (depo. 104–105) ("I saw a patterned behavior" that "allowed me to look at these

other cases in the same light . . . for example, the coincidences of the stop, the probable cause, the search, the behaviors that I documented ad nauseum in my reports aligned"). These similarities were first summarized in the FDLE report and probable cause affidavit by FDLE investigator Special Agent Dyana Chase. In Bedard's opinion, the Sheriff's conduct of "allowing Wester's fabricated probable cause to go unchecked for an extraordinary number of criminal cases and allowing it to be presented to the State attorney" made the Sheriff "complicit in the malicious prosecution of the wrongfully accused defendants." ECF No. 33–4 at 73. He also opined that if Wester's supervisors had "paid attention to the pattern-of-conduct that Wester was exhibiting, they would have detected his crimes." *Id.* In Bedard's opinion, this was evidence of negligent training. *Id.* at 111. Bedard further opined that opined that Wester and Lee engaged in a conspiracy to "plant[] illegal drugs on unsuspecting citizens" and make false reports "for the express purpose of falsifying probable cause" and to "maliciously prosecute" the individuals. *Id.* at 109.

Throughout the report, Bedard commented on Wester's credibility. He noted that the State Attorney found Wester was a necessary and essential witness in the cases he charged but that he could not be relied on because his credibility had been called into question. ECF No. 33–4 at 65. In Bedard's opinion, the cases rely on the

veracity of the deputies, and he stated an opinion that Wester's claims "lack integrity, trustworthiness, and credibility." *Id.* at 110. Bedard stated an "opinion" that Wester did plant drugs in Plaintiffs' vehicles—in this instance Day and Wood's vehicle—crediting their version of the events. *Id.* at 109.

Regarding the Sheriff's conduct, Bedard concluded that the actions of Wester and Lee "show a custom and practice of unwarranted pretextual stops, planting illegal drugs, planting drug paraphernalia and contraband, coercion and false reporting which by de facto is condoned" by the Sheriff, who "knew or should have known that such nefarious behaviors were underfoot." ECF No. 33–4 at 110. He criticized the background investigation into Wester's hiring, conducted by Lt. Mike Hodges, as deficient for failing to uncover or investigate "rumors" in Liberty County about Wester's "moral character" issues.[8] Bedard also thought Hodges was biased in favor of Wester and noted some deviations from standard policy and

---

[8] Bedard commented that Hodges failed to investigate "salacious rumors" of Wester's "sexual misconduct" that were "circulating throughout Liberty County," where Wester had previously worked. ECF No. 33-4 at 85 (citing a newspaper article in which the Sheriff of Liberty County is said to have personally cautioned the Sheriff of Jackson County against hiring Wester based on "rumors of violations of moral character"). Bedard notes that the Liberty County Sheriff had also failed to look into these rumors. Despite labeling this allegation of misconduct as rumor, Bedard also criticized Hodges for failing "to reveal the moral character violations that were *well known* about Wester's past at the time the investigation was conducted." ECF No. 33-4 at 85–86 (emphasis added).

inconsistencies apparent on the face of the background investigation report prepared by Hodges, but he did not identify any factor suggesting Wester was or might plant evidence.  According to Bedard, "the investigation was not reasonable, thorough, objective or consistent with widely accepted police practices and customs regarding background investigations of law enforcement applicants" and "was not conducted in good faith" but rather in "callous disregard and deliberate indifference to the citizens of Jackson County."  ECF No. 33–4 at 86.  Bedard conceded, however, that Wester's file showed he met the necessary qualifications required for the position. *Id.*

Bedard also noted that in 2017, after Wester was hired by the Jackson County Sheriff's Office, he became the subject of an internal affairs investigation of workplace sexual misconduct initiated by Hodges, which resulted in Wester being suspended for four days and received no remedial training.  Bedard opined that this, together with the Liberty County rumors, showed that the Sheriff was aware of Wester's "proclivity toward poor moral character."  ECF No. 33-4 at 101  Bedard opined that Wester's moral character contributed to his conduct of planting evidence and that "allowing Wester to continue engaging in police activities based upon his questionable character was proximate to the Constitutional violations suffered by the

Plaintiffs." ECF No. 33-4 at 111; ECF No. 33–4 at 100 (reasoning, "Wester's moral character violations were bleeding over into other areas of his work. A pattern of unlawful traffic stops was also emerging as Wester began to rack up an excessive amount of drug arrests . . . ."). Bedard also opined that "[f]ailing to fire Wester from the critical, high integrity position of law enforcement officer demonstrates negligent retention." ECF No. 33–4 at 111.

Bedard stated Wester's conduct "reflected the unmistakable pattern of corruption," citing Wester's number of drug arrests that outpaced other officers and irregularities in his body camera use. ECF No. 33–4 at 100. Bedard stated that Wester and Lee "created an overt pattern of suspicious conduct" that supervisors should have noticed. ECF No. 33–4 at 88. Somewhat contradictory, however, Bedard also surmised that Wester's knowledge of police practices and the operation of body worn cameras "allowed him to effectively game the system." ECF No. 33–4 at 87.

In the final opinions summarized in his report, Bedard concluded that Sheriff knew or should have known there was no probable cause for Plaintiffs' arrests given the conduct of Wester and Lee " routinely engaged in a systematic pattern and practice of making illegal traffic stops" and "planting illegal drugs" and that the

Sheriff's failure to act was a moving force in Plaintiffs' injuries.  ECF No. 33–4 at 113.  Bedard also opined that the Sheriff acted with deliberate indifference to the possibility of his deputies making false arrests by his "ignoring the obvious patterns of corruption" by his deputies.  *Id.*

In his deposition (sitting for several cases at once), Bedard testified that he noted no deficiencies in the Sheriff's camera policy other than the fact that "the policy was not being followed," which he then explained as meaning the supervisors were not reviewing Wester's footage.  ECF No. 33–5 at 142–44 (depo. at 141–43) (stating, Wester's supervisors "were kicking the can down the road on who was supposed to be doing that").  Bedard was asked about his review of the foundational materials used to create charts of body camera non-compliance that he had relied on to find that Wester failed to comply with the camera policy.  ECF No. 33–7 at 23 (depo. at 414).  Bedard acknowledged he had not reviewed the underlying data, such as the camera audit trail, and he did not know who had prepared the charts, but he said he had no reason to doubt the charts were accurate.[9]  ECF No. 33–7 at 33 (depo. at 424).  Bedard conceded he did not do a statistical analysis of the camera usage or

---

[9] Bedard stated, that the camera audit trail chart was "sourced out to plaintiffs' attorney . . . [i]t was a bulk of work.  And when it was compiled, it was given to me."  ECF No. 33–7 at 33 (depo. at 424).

CASE NOS. 5:19cv506-MCR/MJF, 5:19cv505-MCR/MJF

of Wester's rate of drug arrests, but he insisted that a pattern of non-compliance could be seen from the cases he reviewed.  ECF No. 33–7 at 36, 48–49 (depo. at 439–440) (noting his was "a collective understanding of how the cameras were being used").  Bedard could not define the point at which the non-compliance showed a pattern that should have alerted supervisors of a problem, but he said based on his experience that a pattern was established early on in this case, and "somebody should have been watching Wester."  ECF No. 33–7 at 71–79 (depo. 462–470) (also commenting, "[a]t what point you call it a pattern, I don't know" but "whatever number I guess a jury decides they want to pick is fine").

## B.    Reliability and Helpfulness

Neither Wester nor the Sheriff challenges Bedard's qualifications,[10] but both challenge the reliability and helpfulness of his opinions.  Wester seeks to exclude Bedard's testimony in total, contending his opinions lack specialized knowledge and are rife with improper speculation regarding subjective intent, baseless conjecture, inappropriate credibility determinations, and inadmissible legal conclusions that will not assist the jury.  Similarly, the Sheriff challenges dozens of specific quoted

---

[10] Although Bedard's qualifications appear to center on use of force issues, in light of his lengthy experience in the field and teaching police procedures, and the absence of any objection, the Court finds he is qualified for purposes of this motion.

CASE NOS. 5:19cv506-MCR/MJF, 5:19cv505-MCR/MJF

statements from Bedard's reports and deposition testimony as speculative, conjecture, and not based on any specialized training, experience, or methodology of a police practices expert.

The Court agrees with Wester and the Sheriff that much of Bedard's report reads like an advocacy-based narrative of the facts, as opposed to expert opinion.[11] Bedard's recitation of facts with gratuitously biased commentary akin to lawyer argument and labeled as "opinions" is improper.  While Rule 702 allows an expert to testify to matters that will assist the jury in determining a fact in issue, and allows an expert to form opinions by assuming disputed facts in favor of one side, the expert cannot merely tell the jury what facts to find.  *See Montgomery*, 898 F.2d at 1541 (expert may "testify as to his opinion on an ultimate issue of fact" provided the expert "does not merely tell the jury what result to reach").  As other courts reviewing Bedard's work have commented, much of his report "do[es] not state expert opinions at all, but simply provide[s] [his] slant on facts that are in the record."  *Daugherty v.*

---

[11] To list a few examples, Bedard stated it was "highly unlikely if not impossible for Wester to have smelled marijuana," ECF No. 33–4 at 40; he concluded there was no probable cause or reasonable suspicion based on Plaintiffs' version of the facts; he stated Wester "*maliciously* framed" citizens for crimes, had questionable moral character, *id.* at 87, and Hodges acted in "callous disregard" during the background investigation, *id.* at 86.  He also made comments such as, Wester was driving around the County with a "virtual pharmacy" in his vehicle. ECF No. 33-8 at 79 (depo. 620).

*Graves*, No. 3:11-CV-458, 2013 WL 501670, at *2 (E.D. Tenn. Feb. 8, 2013) (internal marks omitted) (criticizing an "advocacy based interpretation of the record"); *see also Dougherty v. Hurst*, Case No. 1:17cv72-TFM-C, ECF No. 203 (S.D. Ala. Sept. 15, 2020) (finding Bedard's report "replete with inadmissible 'expert' opinions"). Here, as in those cases, such comments are improper and too numerous to be parsed out line-by-line.

In addition, all credibility determinations and legal conclusions that appear throughout Bedard's report are unhelpful and improper. It is settled law in the Eleventh Circuit that expert testimony "concerning the truthfulness or credibility of a witness is inadmissible because it invades the jury's province in determining credibility." *United States v. Falcon*, 245 F. Supp. 2d 1239, 1245 (S.D. Fla. 2003) (citing *United States v. Beasley*, 72 F.3d 1518, 1528 (11th Cir. 1996)). Bedard states early in his report that he does not make credibility calls, but the bulk of the report shows otherwise. He improperly states that Day and Wood and other plaintiffs are the only credible witnesses, that Wester's claims are untrustworthy, that Wester committed "crimes" in other cases where there has been no such determination, and

he unduly emphasizes the State Attorney's assessment of Wester's credibility.[12] Similarly, Bedard's legal conclusions on the existence of constitutional violations, probable cause, reasonable suspicion, false arrest, and negligence in the supervision or retention of Wester masquerading as "opinions" will be excluded as unhelpful and improper. *See Montgomery*, 898 F.2d at 1541 (stating a "witness also may not testify to the legal implications of conduct; the court must be the jury's only source of law"); *see also See Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1112 n.8 (11th Cir. 2005) ("[C]ourts must remain vigilant against the admission of legal conclusions").

Turning to the substance of his opinions, the Court concludes that Bedard's opinions will not assist the jury on Day and Wood's claims against Wester. The only fact at issue on the claims against Wester in this case is whether Wester planted drugs–either he planted the evidence or he did not. While testimony identifying proper procedures for vehicle stops and searches and deviations from them is the

---

[12] Day and Woods contend Bedard should be allowed to comment on the State Attorney's assessment that Wester had become an unreliable witness for the prosecution, from a law enforcement standard. *See Giglio v. United States*, 405 U.S. 150 (1972) (concluding the state has the responsibility to disclose or correct false evidence or the nonreliability of a witness when the evidence is material and could have affected the judgment of the jury). This is not an issue that requires expert testimony.

CASE NOS. 5:19cv506-MCR/MJF, 5:19cv505-MCR/MJF

type of testimony that is generally acceptable from a police practices expert, *see Jimenez*, 732 F.3d at 721, in this case, Wester's compliance or deviation from standard stop and search protocol does not assist the jury in determining whether he planted the evidence as a matter of fact.[13]   This case stands in stark contrast to an ordinary false arrest case that requires an understanding of the legal concept of probable cause or an excessive force case that requires an understanding of reasonableness and proper judgment under stress in a given context, all of which could be assisted by expert testimony on proper police practices.[14]   Here, there is simply no factual gray zone that could be clarified with professional standards or any legal concept in need of explanation.   Any lay juror would understand without additional specialized knowledge that planting evidence is not a proper police practice and cannot provide probable cause to arrest, and no other violation of police

---

[13] To the extent Plaintiff intended Bedard to testify about certain patterns of Wester's conduct during searches that appear in this and other cases, the Court is unable to see how that would be helpful to determining the facts here, and because the similarities were noted in the FDLE investigator's affidavit, even if relevant, Bedard's testimony appears to be cumulative.  Thus his expert testimony on the issue would not be helpful.

[14] *See, e.g., Washington*, 2016 WL 3545909, at *5 (finding expert testimony on police practices standards that inform an officer's probable cause determination would assist the jury in conducting its own analysis of a false arrest claim); *Daugherty*, 2013 WL 501670, at *4 (admitting Bedard's testimony on police practices relevant to the use of force and whether police conduct in a particular instance violated those standards).

CASE NOS. 5:19cv506-MCR/MJF, 5:19cv505-MCR/MJF

procedure is alleged to have caused Day and Wood harm.[15]   Therefore, Wester's motion will be granted.

As to Day and Wood's claims against the Sheriff, the Court also finds that Bedard's expert testimony must be excluded as unreliable and unhelpful.  Overall, despite stating that his methodology involved a comparative analysis between the facts and accepted professional standards, Bedard's report contains little actual analysis or comparison with policies or professional standards.  Instead, as discussed below, he makes conclusory statements and gives opinions based on his view of the evidence and his credibility assessments, with no explanation of how the facts relate to his specialized knowledge or experience and without any citation to data, literature, or specific professional standards.

The constitutional claims against the Sheriff require proof that an official policy, or a widespread custom having the force of law, caused a constitutional violation.[16]   *See Monell*, 436 U.S. at 694–95.  A custom or policy of inadequate

---

[15] The case also includes a conspiracy claim, but Bedard's opinions regarding whether a conspiracy existed are not within the scope of proper police practices expert testimony.

[16] A custom may be shown when "a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." *Cottone v. Jenne,* 326 F.3d 1352, 1360-61 (11th Cir. 2003). "In other words, a longstanding and widespread practice is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991).

CASE NOS. 5:19cv506-MCR/MJF, 5:19cv505-MCR/MJF

training or supervision may be the basis for liability only if it amounts to a deliberate indifference to the rights of persons with whom the police come into contact. *See Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (citing *City of Canton v. Harris*, 489 U.S. 378, 380 (1989)). This requires some evidence that the municipality knew of the need for additional training or supervision or the need was obvious—either through repeated complaints met with no meaningful attempt to investigate or cure the misconduct, or if a constitutional violation was a "highly predictable consequence" of the lack of supervision or training. *Id.* Deliberate indifference may be shown "through expert testimony that a practice condoned by the defendant municipality was 'contrary to the practice of most police departments' and was 'particularly dangerous' because it presented an unusually high risk that constitutional rights would be violated." *Vann v. City of New York,* 72 F.3d 1040 (2d Cir. 1995) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985)).

Bedard's opinions on "custom" for *Monell* purposes are (1) that Wester had a custom and practice of unwarranted pretextual stops and planting evidence "that was condoned" by the Sheriff through a lack of supervision, and (2) the Sheriff acted

---

The municipality's custom or practice must be the "moving force" behind the injury. *See Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997).

CASE NOS. 5:19cv506-MCR/MJF, 5:19cv505-MCR/MJF

with deliberate indifference to the possibility of false arrests by "ignoring obvious patterns of corruption" and failing to implement adequate hiring and supervisory procedures.  These opinions are not supported by a reliable methodology or analysis. Bedard identified a custom of pretextual stops and planting evidence to falsely arrest Day and Wood and others without any supporting office-wide analysis of data showing that these violations in fact existed and were widespread throughout the department.  Instead, Bedard's opinions singularly focused on the conduct of Wester as creating the custom, and he *assumed* that that the stops were improper and that evidence was planted on other occasions.[17]  But *Wester's* conduct alone cannot establish a widespread custom on the part of the *Sheriff*.  Also, Bedard does not reference any record of actual complaints to the Sheriff about improper stops or the planting evidence, and none of the allegations now raised in suits against Wester were known at the time.[18]  Bedard's unsupported opinion that the supervisors *should*

---

[17] Bedard references a failure to supervise "deputies," but the only additional deputies referenced are Lee and John Allen.  Lee is accused of helping Wester in "select" cases and Allen allegedly provided a false affidavit in one case and coerced one defendant to become a confidential informant.  Their alleged conduct does not transform those isolated instances into a "widespread custom," and neither was involved in this case this case.  Bedard's reference to "deputies" is vague and speculative.

[18] Bedard notes in his report only that the public defender had received complaints and had told the State Attorney.  ECF No. 33–4 at 104.  He makes no reference to the Sheriff receiving any complaints, however.

CASE NOS. 5:19cv506-MCR/MJF, 5:19cv505-MCR/MJF

*have known* about Wester's conduct based on his other policy violations is insufficient under *Monell* and does not show deliberate indifference to the constitutional violation alleged.  Thus, Bedard's conclusory opinion that the Sheriff "condoned" a "custom" of prior improper traffic stops and false arrests is nothing but *ipse dixit*.[19]  *See Joiner*, 522 U.S. at 146.

As to a custom of failure to supervise, Bedard again conducted no analysis. Bedard did not identify Wester's supervisors or explain what each did or how their review was deficient as compared to any established professional standard or as contrasted with the accepted practices of other police departments.  Bedard provided no analysis, literature or special experience to suggest or explain how Wester's unchecked policy violations were of a type that could be considered "particularly dangerous" and thus presented an unusually high risk that constitutional rights would be violated if not reviewed.  Bedard's report is devoid of any data from other sheriff's offices, independent testing or analysis, or studies that could suggest this

---

[19] Bedard stated, "the evidence exists in over 100 cases dropped by prosecutors . . . that collectively show Wester engaging in a *pattern of conduct* that had become customary." ECF No. 33–4 at 106 (emphasis added).  There was not a finding of improper stops or false evidence in every case.  In fact, as Bedard noted earlier in his report, the State Attorney dropped the cases based on a pattern of conduct and the Teresa Odom tape, "short of actual evidence in every case that Wester absolutely planted drugs" because "Wester had become an unreliable witness for the State." ECF No. 33–4 at 68.

CASE NOS. 5:19cv506-MCR/MJF, 5:19cv505-MCR/MJF

lack of review amounted to deliberate indifference to constitutional rights. *See Bakst as Trustee for Flaster v. Tony*, Case No. 13-CV-61411-MARRA, 2019 WL 11497844, at **3–4 (S.D. Fla. 2019) (excluding expert opinion on policy and custom and a lack of supervision finding no method, independent testing, or analysis of data, and opinions were based on credibility calls and a lack of specialized knowledge). Absent a reasoned analysis supported by data, identified standards, or comparison with practices in other sheriff's offices, Bedard's opinions are conclusory and unreliable, based on mere conjecture, assumption, credibility calls, and amounting to no more than *ipse dixit*, which is neither reliable nor helpful.[20]

On the state law negligence claims, Bedard's expert opinions fare no better. Importantly, Bedard explained nothing about the camera policy itself that requires expert opinion to identify incidents of non-compliance.  He performed no statistical analysis related to the camera non-compliance or Wester's high rate of drug arrests as compared to other deputies and conceded this was within the jurors' capability to

---

[20] For example, statements amounting to *ipse dixit* include his mere conclusions such as that Wester had "shady probable cause" for the stops, that the failure to supervise camera usage led to misconduct, that rumors of sexual misconduct and bad moral character led directly to the planting of evidence, that if supervisors had paid attention, they would have uncovered Wester's crimes, that the Sheriff "bears responsibility for the debauchery of Wester and the environment that allowed his corruption to flourish," and that the Sheriff ratified or "condoned" a custom of pretextual stops or false arrests, to list a few.

CASE NOS. 5:19cv506-MCR/MJF, 5:19cv505-MCR/MJF

discern.  Bedard relied on charts showing body camera non-compliance data but, as noted, he failed to review the foundational materials from which the charts were compiled and simply assumed they were reliable; thus he cannot reliably base any opinion on them.

Bedard identified an obvious need for training in light of the lack of supervision over Wester's policy compliance and opined that the Sheriff or a reasonable supervisor should have noticed the need, but his analysis is not supported by literature, studies, a comparison with other sheriff's offices' practices, or specific standards of conduct or training for supervisors.[21]   For example, he stated in a conclusory fashion without citation to authority:  "The conduct of a law enforcement officer must be monitored and addressed by the officer's employing agency. It is incumbent upon the Chief executive to make certain that all employees comply with policy and law."  ECF No. 33–4 at 22.  And is need for training analysis is supported only by one citation to literature for the proposition that it is true among police chiefs

---

[21] In his discussion of negligent supervision, Bedard quoted from the IACP National Law Enforcement Policy Center model policy on the prevention of employee misconduct, but the provision states that the supervisor's responsibility is to maintain and reinforce employee conformance with "*the standards of conduct of this department*."  However, Bedard did not further identify or discuss what those specific standards were or compare them to the conduct in this case other than in a conclusory manner.

CASE NOS. 5:19cv506-MCR/MJF, 5:19cv505-MCR/MJF

that "10 percent of their officers cause 90 percent of the problems."  ECF No. 33–4 at 88 (citing Walker, et al. 2010).  Bedard failed to identify or discuss what Wester's supervisors should have done under the Sheriff's policy or how frequently reviews were required or what they should have been trained on.  Thus, his analysis lacks the type of rigor required of an expert and amounts to mere *ipse dixit*.  *See Joiner*, 522 U.S. at 146.

In addition, Bedard's opinions criticizing the hiring process and background investigation of Wester are based on conjecture about moral character and are not helpful.  Bedard actually cites "rumor" as well as an after-the-fact newspaper report and a personal conversation as sources.[22]  *See e.g.,* ECF No. 33–4 at 37-38 (citing an October 2018 Tallahassee Democrat article about "allegations of hanky-panky"); *id.* (Bedard commented that "information given to [Jackson County Sheriff] Roberts firsthand by [Liberty County Sheriff] Finch involved rumors of violations of moral character" and "[t]hese rumors were sexual in nature"); ECF No. 33–8 at 12–13 ("There was a lot of salacious information that had never been examined.").  This will not assist the jury with any issue and also would be excluded under the balancing

---

[22] Bedard states that the Sheriff of Liberty County told a newspaper journalist that he had ordered Wester fired on "hearing whispers of him having sex…on duty, sex with married women, stuff like that," but Wester was instead allowed to resign.  ECF No. 33–4 at 35.

CASE NOS. 5:19cv506-MCR/MJF, 5:19cv505-MCR/MJF

test of Rule 403. Also, nothing was unearthed in the hiring process amounting to deliberate indifference to the constitutional violations alleged here.   When discussing negligent retention, Bedard referenced Sheriff's Office policy related to making false statements, but there is no showing that the Sheriff knew of any false statement prior to Day and Wood's arrest so the opinion is not based on good grounds.   Moreover, any connection Bedard draws between the rumored sexual misconduct, the relationship misconduct for which Wester was suspended, and the planting of false evidence to show negligent retention is conclusory and based solely on *ipse dixit*.

Therefore, the Sheriff's motion to exclude Bedard will be granted.  The Sheriff also moves to exclude Bedard's rebuttal report, challenging the opinions of the Sheriff's expert, Robert Pusins.  Because Bedard's rebuttal report suffers the same flaws as his initial report, it will also be excluded.

Accordingly, Wester's *Daubert* Motion to Exclude Expert Opinions of Roy Bedard, PhD, Case No. 5:19cv506-MCR/MJF, ECF No. 33, and Case No. 5:19cv505-MCR/MJF, ECF No. 31, is **GRANTED**.  The Sheriff's *Daubert* Motion to Exclude Expert Opinions of Plaintiff's Expert Witness, Roy Bedard, Case No. 5:19cv506-MCR/MJF, ECF No. 34, and Case No. 5:19cv505-MCR/MJF, ECF

No. 32, is **GRANTED**.  The Clerk is directed to file a copy of this Order in both

cases.

      **DONE AND ORDERED** this 31st day of  March 2022

*M. Casey Rodgers*

**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**